**WO**

# IN THE UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF ARIZONA

Mark E Stuart,

          Mr. Stuart,

v.

City of Scottsdale, et al.,

          Defendants.

No. CV-17-01848-PHX-DJH (JZB)

**ORDER**

      This matter, on remand from the Ninth Circuit, arises out of Plaintiff Mark Stuart's ("Mr. Stuart") arrest at the February 7, 2017, Scottsdale City Council Meeting (the "February Meeting"). Mr. Stuart brought suit against Defendants former Scottsdale Mayor Jim Lane ("Mayor Lane"), former Scottsdale City Attorney Bruce Washburn ("Attorney Washburn"), Scottsdale Assistant City Attorney Luis Santaella ("Attorney Santaella"), Scottsdale Police Officer Tom Cleary ("Officer Cleary"), Scottsdale Police Officer Jason Glenn ("Officer Glenn") (together the "Individual Defendants"), and the City of Scottsdale ("the City") (collectively the "Defendants"). Plaintiff initially raised nineteen claims arising out of his arrest. Two claims remain. Count Two alleges Defendants interfered with and retaliated against Mr. Stuart's First Amendment rights, and Count Nine alleges the City, Mayor Lane, and Attorney Washburn maintained unconstitutional policies, practices, and customs.

      Before the Court is the Individual Defendants' "Motion for Summary Judgment

Regarding Qualified Immunity" (Doc. 251)[1] ("Motion") and the Defendants' collective "Supplement" thereto (Doc. 282).[2]  The Court must decide whether Mr. Stuart's claims are precluded under the doctrines of qualified immunity, claim preclusion, and/or issue preclusion.

## I.      Background

Below is an overview of the underlying facts and procedural history of the present matter, as well as Mr. Stuart's related actions in Arizona federal and state courts.

### A.      The Present Matter[3]

#### 1.      Mr. Stuart's Speech about the Save Our Preserve Ballot Initiative

Mr. Stuart started the Save Our Preserve ballot initiative (the "SOP Initiative") to advocate against the construction of the Desert Discovery Center (the "DDC") in the McDowell Sonoran Preserve.  (Doc. 5 at 5–13).  Mr. Stuart gave updates about the SOP Initiative during the public comment sessions of Scottsdale City Council Meetings.[4]  At the January 17 and 24, 2017, City Council meetings (the "January Meetings"), Mr. Stuart advertised the SOP Initiative; solicited volunteers, petition signatures, and votes; and announced his intent to initiate an "SB 1487 investigation" into misuse of City funds to promote building the DDC as an election issue.  (Doc. 298 at 2).  *See* Archived Video of January 17, 2017, City Council Meeting, at 28:15–31:55, City of Scottsdale https://scottsdale.granicus.com/player/clip/7806?view_id=106&redirect=true (last visited March 19, 2024); *see* Archived Video of January 24, 2017, City Council Meeting, at 10:43–

---

[1] The matter is fully briefed.  The Mr. Stuart filed a Response (Doc. 298) and the Individual Defendants filed a Reply (Doc. 314).

[2] The matter is fully briefed.  Mr. Stuart filed a Response (Doc. 299) and Defendants filed a Reply (Doc. 313).

[3] Unless where otherwise noted, the facts in this subsection are undisputed.

[4] The Court is taking judicial notice of the Scottsdale City Council Meeting Video Archives under Federal Rule of Evidence 201, as the videos constitute information from a government website whose authenticity is beyond dispute.  *See DanielsHall v. Nat'l Educ. Ass'n*, 629 F.3d 992, 998–99 (9th Cir. 2010).  *See also* 2017 City Council Meeting Video Archives, City of Scottsdale, https://www.scottsdaleaz.gov/scottsdale-video-network/council-video-archives/2017-archives (last visited March 19, 2024).

14:16, City of Scottsdale, https://scottsdale.granicus.com/player/clip/7824?view_id=106&redirect=true (last visited Mar. 19, 2024).

On January 30, 2017, Attorney Washburn sent Mr. Stuart a letter (the "Warning Letter") to bring A.R.S. § 38-431.01(I)[5] (the "Open Meeting Law") to his attention. That statute states, in relevant part, that:

> A public body may make an open call to the public during a public meeting, subject to reasonable time, place and manner restrictions, **to allow individuals to address the public body on any issue within the jurisdiction of the public body.**

(Doc. 298-1 at 3 (quoting A.R.S. § 38-431.01(I)) (emphasis in original)). Attorney Washburn alerted Mr. Stuart that he is prohibited from talking about the SOP Initiative at public comment because "[t]he obtaining of signatures on petitions is not a matter that is within the jurisdiction of the Scottsdale City Council, and therefore under the Open Meeting Law is not a permissible topic to be addressed during the call to the public." (*Id.*) Attorney Washburn further stated that Mr. Stuart's presentation "implicates the provisions of A.R.S. § 9-500.14[6] regarding using City resources for the purpose of influencing the outcome of an election." (*Id.*) Attorney Washburn explained to Mr. Stuart that he is "of course, free to address [his] comments to other matters that are within the Council's jurisdiction, such as, for example, whether they should authorize any particular construction that might take place in the Preserve, but state law does not permit [him] to use the call to the public to address matters that are not within the Council's jurisdiction." (*Id.*) Attorney Santaella obtained a copy of Attorney Washburn's Warning Letter and forwarded it to Officer Cleary on January 31, 2017. (Docs. 298-12 at 32–33; 251-2 at 5). Officer Glenn was also aware of the Warning Letter. (Doc. 251-2 at 12).

---

[5] Defendants refer to A.R.S. § 38-431.01(H) at the time of these events, which is now codified at A.R.S. § 38-431 .01(I).

[6] A.R.S. § 9-500.14 states that "[a] city or town shall not spend or use its resources, including the use or expenditure of monies, accounts, credit, facilities, vehicles, postage, telecommunications, computer hardware and software, web pages, personnel, equipment, materials, buildings or any other thing of value of the city or town, for the purpose of influencing the outcomes of elections." A.R.S. § 9-500.14(A).

Mr. Stuart responded to the Warning Letter and characterized it as a "Threat to Infringe [his] Arizona and US Constitutional Rights." (Doc. 298-1 at 2).  Mr. Stuart replied "I will be updating the City on the progress of the Save Our Preserve Ballot Initiative at every meeting.  Neither you [(Attorney Washburn)] nor the council has any legal authority to limit public discussion during public comments.  If you want to prevent me from exercising my rights, you need to get an TRO [(Temporary Restraining Order)]." (*Id.*)

## 2.    The February 17, 2017, City Council Meeting

Mayor Lane was the presiding officer of the February Meeting.  (Doc. 251-3 at 2). Officer Glenn and Officer Cleary were assigned "Off Duty Security positions" and their responsibilities were to "keep public order during the City Council meetings." (Doc. 251-2 at 5).  That morning, Mr. Stuart emailed Attorney Washburn and Mayor Lane a copy of the SOP Initiative presentation (Doc. 298-2 at 5–21) that he intended to deliver during public comment. (Docs. 298-1 at 4; 298-2 at 4).  In response, Attorney Washburn reiterated his prior statements in the Warning Letter that presentation on the SOP Initiative in this manner is not permissible under the Open Meeting Law and implicates A.R.S. § 9-500.14. (Doc. 298-1 at 4).  Before the February Meeting started, Officer Cleary spoke privately with Mr. Stuart and shared he was aware of Mr. Stuart's correspondence with Attorney Washburn. (Doc. 251-2 at 6).  Officer Cleary told Mr. Stuart that the Mayor Lane had the authority to regulate the meeting, and that if Mayor Lane told him to step away from the podium, he needed to comply.  (Docs. 251-2 at 6; 298-20 at 48).

Mr. Stuart tried to give his SOP Initiative presentation during public comment. *See* Archived Video of February 07, 2017, City Council Meeting, at 22:30–26:07, https://scottsdale.granicus.com/player/clip/7853?view_id=106&redirect=true&h=4ac9d6 393cb0f0e5e187305654cdd222 (last visited Mar. 19, 2024) ("February Video").  Before Mr. Stuart could begin his presentation, Mayor Lane reminded him that, to the extent he intended to speak about the SOP Initiative, he had been advised that the Open Meeting Law and A.R.S. § 9-500.14 "prohibits [him] from advertising or soliciting votes" "to influence an election one way or the other." *Id*. at 23:00–23:32.  Mr. Stuart insisted he had

a right to do so and "whoever told him [(Mayor Lane)] that, I'm assuming Mr. Washburn," is incorrect. *Id*. at 23:32–23:42. In response, Mayor Lane said he was not going to debate the issue, but "if you'd like to speak toward a subject that's within the jurisdiction of this Council . . . [we'd] all be happy to hear it." *Id*. at 23:43–24:02. Mayor Lane invited Mr. Stuart to speak about something other than trying to influence an election, whether for or against issues, and using public resources for that purpose. *Id*. at 24:10–24:18. Mayor Lane also emphasized that efforts to do so on either side of an election would be prohibited. *Id*. at 25:13–25:24.

Mr. Stuart insisted, over and over again while interrupting Mayor Lane, that he had a right to use City resources and that Mayor Lane was preventing him from speaking freely. *Id*. at 24:03–25:27. Mayor Lane asked Mr. Stuart "either to leave the podium or continue to talk about something other than trying to influence the election." *Id*. at 25:27–25:35. When Mr. Stuart insisted that, "I'm going to give our Save Our Preserve ballot initiative update . . . every 2 weeks [and] there's nothing that you can do to stop me," Mayor Lane asked Mr. Stuart to "simply remove yourself then from the podium." *Id*. at 25:35–25:54. Mr. Stuart responded, "I'm not willing to do that. I would like to give my full public comment." *Id*. at 25:54–25:58. Mayor Lane then asked Scottsdale police officers to escort Mr. Stuart out of the meeting. *Id*. at 25:58–26:07.

Officer Cleary and Officer Glenn approached Mr. Stuart and requested that he leave the podium. (Doc. 251-2 at 7). Mr. Stuart asked if he could remain to address another item on the agenda. (*Id*.) Officer Cleary replied that Mr. Stuart could remain in the meeting to address the item if he complied with the request to sit down. (*Id*.) Officer Cleary further advised Mr. Stuart if he did not leave the podium he would be arrested for trespassing. (*Id*.) Because Mr. Stuart refused to sit down, Officer Cleary told him that he was under arrest, and Officer Cleary and Officer Glenn escorted Mr. Stuart from the podium to the outside of the building. (*Id*. at 7, 8). While outside, Mr. Stuart was also cited with failure to obey a police officer. (*Id*. at 8).

Officer Cleary filled out the Incident / Investigation Report charging Mr. Stuart with

criminal trespass in the second degree under A.R.S. § 13-1503A and failure to obey a police officer under Scottsdale City Code ("S.C.C.") § 19-13 (Doc. 251-2 at 2–9), which Officer Glenn supplemented (*id.* at 12–13). "Police General Order 2014" was in place at that time and provided guidelines for Scottsdale police officers while working the security detail at City Council meetings. (Docs. 251-2 at 5; 251-4 at 2–3; 298-6 at 3–4). Officer Cleary cited Police General Order 2014 in the Incident / Investigation Report and explained it established that "[t]he Mayor is the designated Parliamentarian for City Council meetings" who "conducts the meeting and is responsible for determining when someone's conduct becomes disruptive. Barring any threatening conduct, officers are directed to wait until directed by the Parliamentarian to take any action." (Doc. 251-2 at 5). Mr. Stuart was transported and booked into the City jail. (*Id.*)

### 3.     Mr. Stuart's Claims (Doc. 5)

In June 2017, Mr. Stuart filed suit against Defendants.[7]   (Doc. 1).   His First Amended Complaint ("FAC") (Doc. 5) alleged nineteen counts for violations of his federal and state constitutional and statutory rights, including freedom of speech, freedom of assembly, freedom of association, equal protection, due process, freedom from unlawful seizure and arrest, freedom from excessive force, intentional infliction of emotional distress, negligence, and violations of 42 U.S.C. § 1983. (*See generally id.*) The Court granted Defendants' Motion to Dismiss all counts of the FAC with prejudice (Doc. 158) and the Clerk of Court entered judgement accordingly. (Docs. 163; 164). Mr. Stuart appealed to the Ninth Circuit. (Doc. 165).

### 4.     The Ninth Circuit's Remand (Doc. 170)

On appeal, the Ninth Circuit affirmed this Court's dismissal of Counts One, Three–Eight, and Ten–Nineteen.[8]   It reversed the Court's dismissal of Counts Two and Nine.

---

[7] In addition to Defendants, other parties were named to this action: Scottsdale City Councilmembers Phillips, Littlefield, Klapp, Milhaven, Korte, and Smith; Scottsdale City Manager Thompson; Former Scottsdale Police Chief Rodbell; Scottsdale Police Commander Hall; Scottsdale City Clerk Jagger; Scottsdale Police Officers Kaufmann and Stumpf; and Scottsdale Director of Parks and Recreation Pryor. They have all since been dismissed.

[8] These counts included 42 U.S.C. § 1983 claims, such as Mr. Stuart's Fourth Amendment

Mr. Stuart's Section 1983[9] claim under Count Two is a First Amendment interference and retaliation claim and alleges Defendants wrongfully arrested him for exercising his First Amendment rights at the February Meeting. (Doc. 5 at ¶¶ 90–95). The Ninth Circuit held this Court improperly determined on a motion to dismiss that Mayor Lane and Officer Cleary and Glen were entitled to qualified immunity because Mr. Stuart plausibly alleged that (1) "[Mayor] Lane imposed a restriction on [Mr. Stuart'] speech at the city council meeting that was not reasonable and viewpoint neutral"; and (2) "[Officer] Cleary and [Officer] Glenn handcuffed Stuart and ejected him from the city council meeting because of Stuart's valid exercise of his First Amendment rights during the public comment portion of the city council meeting." (Doc. 170-1 at 3–4).

Count Nine arises under *Monell v. Department of Social Services of New York*, 436 U.S. 658 (1978) ("*Monell*") and is brought against the City, Mayor Lane, and Attorney Washburn. (Doc. 5 at ¶¶ 150–166). Mr. Stuart alleges the City, Mayor Lane, and Attorney Washburn carried out policies and procedures that violated Mr. Stuart's constitutional rights under the First, Fourth, Fifth, and Fourteenth Amendments. (*Id.*) The Ninth Circuit held this Court improperly determined that Mr. Stuart failed to set forth facts establishing municipal liability because he "plausibly alleged that Lane had final policymaking authority for Scottsdale," "instructed Stuart to stop speaking," and "ordered police officers Cleary and Glenn to remove Stuart from the meeting," to which they obeyed. (Doc. 170-1 at 4–5).

---

claim that he was subject to an unlawful seizure following the February Meeting (Count One); Mr. Stuart's Fourth Amendment claim that Officer Cleary used excessive force in his arrest of Plaintiff (Count Three); Mr. Stuart's claim that he was denied his First Amendment rights when Defendants ordered him to take down his signs (Count Four); Mr. Stuart's claim that he was denied due process under the Fifth and Fourteenth Amendment when Defendants issued his citation (Count Six); Mr. Stuart's claim that he was denied equal protection under the Fourteenth Amendment when Defendants prosecuted Plaintiff for trespassing based on the content of his speech (Count Seven); and Mr. Stuart's claim that a City Council Rule of Procedure was unconstitutional under the First Amendment (Count Eight). (Doc. 170-1). They also included Mr. Stuart's claim that that the City, Mayor Lane, Attorney Washburn, Attorney Santaella, Officer Cleary, and Officer Glenn conspired to violate his constitutional rights (Count Five) and various state law claims (Counts 10–19).

[9] Unless where otherwise noted, all Section references are to Title 42 of the United States Code.

Defendants now move for summary judgment on Counts Two and Nine on qualified immunity, claim preclusion, and/or issue preclusion grounds.  (Docs. 251; 282).  Before engaging in a discussion of these arguments, the Court finds it necessary to describe the other related litigation involving Mr. Stuart and his arrest at the February Meeting.

### B.    Related Litigation[10]

#### 1.    Arizona State Court Criminal Proceedings

The State of Arizona prosecuted Mr. Stuart for his citations at the February Meeting—that is, (1) criminal trespassing under A.R.S. § 13-1503A, which is a Class 2 Misdemeanor, and (2) and failing to obey a police officer under S.C.C. § 19-13, which is a Class 1 Misdemeanor.  *Arizona v. Stuart*, No. SC-2017003568 (Scottsdale City Ct. Feb. 16, 2017).  On February 10, 2020, City of Phoenix Judge Sampanes held a bench trial and found Mr. Stuart not guilty for criminal trespassing but guilty for failing to obey a police officer.   Judgment and Sentence, *Arizona v. Stuart*, No. SC-2017003568 (Scottsdale City Ct. Feb. 10, 2020) (the "State Court Judgment"); (Doc. 282 at 80).  On April 22, 2020, Judge Sampanes denied Mr. Stuart's motion to vacate the State Court Judgment.  Minute Entry, *Arizona v. Stuart*, No. SC-2017003568 (Scottsdale City Ct. April 22, 2020) (Doc. 299-1 at 2).

Mr. Stuart appealed to the Superior Court of Arizona for Maricopa County, and Superior Court Judge Douglas Gerlach affirmed Mr. Stuart's conviction.  Record Appeal Ruling / Remand, *Arizona v. Stuart*, No. LC2020-000239-001 DT (Maricopa Cnty. Super.

---

[10] This Court is taking judicial notice of the pleadings and orders in Mr. Stuart's closely related actions—namely, (1) an action that Mr. Stuart filed in this district before Arizona District Judge James A. Teilborg, Case No. 2:20-cv-00755-JAT; and (2) Mr. Stuart's Arizona state court criminal proceedings regarding his arrest and charge for criminal trespass and failure to obey a police officer at the February Meeting.  *See PageMasters, Inc. v. Autodesk, Inc.*, 2009 WL 825810, at *2 (D. Ariz. 2009) ("Pleadings and orders in other actions are matters of public record, and hence properly the subject of judicial notice.") (citing, *inter alia, Reyn's Pasta Bella, LLC v. Visa USA, Inc.*, 442 F.3d 741, 746 n. 6 (9th Cir. 2006) (taking judicial notice, as a matter of public record, "pleadings, memoranda, expert reports, etc., from [earlier] litigation[,]" which were thus "readily verifiable")); *see also* Fed. R. Evid. 201(c) (courts "must take judicial notice if a party requests it and the court is supplied with the necessary information"); *see also* Fed. R. Evid. 201(b) (courts may take judicial notice of facts "generally known within the trial court's territorial jurisdiction" or facts that "can be accurately and readily determined from sources whose accuracy cannot reasonably be questioned").

Ct. Nov. 13, 2020) (the "Appeal Ruling"); (*see also* Doc. 282 at 82–107).  Mr. Stuart then appealed to the Court of Appeals of Arizona, which again affirmed Mr. Stuart's State Court Judgment.  *Arizona v. Stuart*, 2021 WL 5571772 (Ariz. Ct. App. Nov. 30, 2021).  Mr. Stuart then petitioned the Arizona State Supreme Court for review, which was denied.  *Arizona v. Stuart*, No. 1 CA-CR 20-0620, 2021 WL 5571772 (Ariz. Ct. App. Nov. 30, 2021) *review denied* (June 3, 2022).  Last, Mr. Stuart filed Petition for Writ of Certiorari with the United States Supreme Court for review, which was denied on January 9, 2023.  *Stuart v. Arizona*, 143 S. Ct. 573, 214 L. Ed. 2d 339 (2023).  Thus, the State Court Judgment convicting Mr. Stuart for failing to obey a police officer under S.C.C. § 19-13 became final on January 10, 2023.

## 2.     Arizona District Court Matter: *Stuart II*

In April 2020, Mr. Stuart and his wife, Mrs. Stuart, initiated *Stuart v. City of Scottsdale*, No. 2:20-cv-00755-JAT ("*Stuart II*") against the City; Mayor Lane; Scottsdale City Councilmembers Phillips, Littlefield, Whitehead, Klapp, Milhaven, and Korte; Scottsdale City Manager Thompson; Attorney Washburn; Scottsdale Senior Assistant City Attorney Anderson; and Scottsdale City Clerk Jagger.  Mr. Stuart and his wife had filed various amended complaints alleging claims under Arizona state law and Section 1983, including a *Monell* claim, which stemmed from the defendants' application for a writ of garnishment.  *Stuart II*, ECF Nos. 1; 27; 93.

Judge Teilborg granted in part the defendants' motion for partial summary judgment on the claims raised in the Stuarts' second amended complaint.  *Id.*, ECF No. 119.  In so doing, Judge Teilborg found that defendants Mayor Lane; Attorney Washburn; Senior Assistant City Attorney Anderson; and Scottsdale City Councilmembers Klapp, Korte, Milhaven, Littlefield, Phillips, and Whitehead were entitled to qualified immunity on all federal claims against them.[11]  *Id*.  Judge Teilborg later ordered summary judgment in favor of the defendants on all remaining claims.  *Id.*, ECF No. 151 ("Judge Teilborg's Summary Judgment Order").  The Clerk of Court entered final judgment on March 9, 2022.  *Id.*, ECF

---

[11] Qualified immunity applied to the claims as alleged under counts one, two, three, and four of the Second Amended Complaint.  *Stuart II*, ECF No. 119.

1   No. 152.  Mr. Stuart and his wife appealed these Orders, *id.*, ECF Nos. 153; 162, and the

2   Ninth Circuit affirmed in all respects.  *Id.*, ECF No. 169.  *Stuart II* remains closed.

## II.   Summary Judgment Standards

4          A court will grant summary judgment if the movant shows there is no genuine

5   dispute of material fact and the movant is entitled to judgment as a matter of law.  Fed. R.

6   Civ. P. 56(a); *Celotex Corp. v. Catrett*, 477 U.S. 317, 322–23 (1986).  A factual dispute is

7   genuine when a reasonable jury could return a verdict for the nonmoving party.  *Anderson*

8   *v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A court does not weigh evidence to

9   discern the truth of the matter; it only determines whether there is a genuine issue for trial.

10  *Jesinger v. Nevada Fed. Credit Union*, 24 F.3d 1127, 1131 (9th Cir. 1994).  A fact is

11  material when identified as such by substantive law.  *Anderson*, 477 U.S. at 248.  Only

12  facts that might affect the outcome of a suit under the governing law can preclude an entry

13  of summary judgment.  *Id.*

14         The moving party bears the initial burden of identifying portions of the record,

15  including pleadings, depositions, answers to interrogatories, admissions, and affidavits,

16  that show there is no genuine factual dispute.  *Celotex*, 477 U.S. at 323.  Once shown, the

17  burden shifts to the non-moving party, which must sufficiently establish the existence of a

18  genuine dispute as to any material fact.  *See Matsushita Elec. Indus. Co. v. Zenith Radio*

19  *Corp.*, 475 U.S. 574, 585–86 (1986); *see also Celotex Corp.*, 477 U.S. at 324 (holding the

20  nonmoving party bears the burden of production under Rule 56 to "designate specific facts

21  showing that there is a genuine issue for trial").  The evidence of the non-movant is "to be

22  believed, and all justifiable inferences are to be drawn in his favor."  *Anderson*, 477 U.S.

23  at 255.  But if the non-movant identifies "evidence [that] is merely colorable or is not

24  significantly probative, summary judgment may be granted."  *Id.* at 249–50

25  (citations omitted).  "Where the record taken as a whole could not lead a rational trier of

26  fact to find for the nonmoving party, there is no genuine issue for trial."  *Ricci v. DeStefano*,

27  557 U.S. 557, 586 (2009).

28         "[W]here [] the moving party bears the burden of proof at trial, it must come forward

1   with evidence which would entitle it to a directed verdict if the evidence were

2   uncontroverted at trial." *Houghton v. South*, 965 F.2d 1532, 1536 (9th Cir. 1992). The

3   standard for granting summary judgment thus "mirrors the standard for a directed verdict

4   under Federal Rule of Civil Procedure 50(a)[.]" *Celotex*, 477 U.S. at 323.

5   **III.   Discussion**

6       In their Motion, the Individual Defendants argue they are entitled to qualified

7   immunity because no authority proscribed their conduct at the February Meeting, and they

8   did not violate a clearly established right held by Mr. Stuart. (Doc. 251 at 7–15). In

9   opposition, Mr. Stuart argues the record shows Officer Cleary and Officer Glenn arrested

10  him without probable cause in violation of his Fourth Amendment rights (Doc. 298 at 11–

11  14). Mr. Stuart further contends and Mayor Lane, Attorney Washburn, and

12  Attorney Santaella subjected him to viewpoint discrimination and retaliatory actions that

13  chilled his speech in violation of his First Amendment rights. (*Id*. at 14–21).

14      Defendants' Supplement argues for summary judgment on *res judicata* grounds.

15  (*See generally* Doc. 282). First, Defendants argue Judge Teilborg already ruled on—and

16  disposed of—Mr. Stuart's prior *Monell* claim against the City, Mayor Lane, and

17  Attorney Washburn, and so Mr. Stuart's *Monell* claim under Count Nine is barred by claim

18  preclusion. (*Id*. at 4–7). Second, Defendants contend that material issues of fact and law

19  were settled in Mr. Stuart's state court criminal proceedings, and so Mr. Stuart's First

20  Amendment retaliation claim under Count Two must fail due to issue preclusion. (*Id*. at 7–

21  10). Third, Defendants argue application of issue preclusion further necessitates a finding

22  that the Individual Defendants are entitled to qualified immunity. (*Id*.)

23      The Court will begin its assessment with the *res judicata* arguments Defendants

24  raise in their Supplement and then will assess the merits of the Individual Defendants'

25  qualified immunity arguments.

26      **A.   *Res Judicata***

27      The preclusive effect of a former adjudication is generally referred to as

28  "*res judicata.*" *Robi v. Five Platters, Inc.*, 838 F.2d 318, 321 (9th Cir. 1988). The policy

behind *res judicata* is to "protect adversaries from the expense and vexation attending multiple lawsuits, to conserve judicial resources, and to foster reliance on judicial action by minimizing the possibility of inconsistent decisions." *Americana Fabrics, Inc. v. L & L Textiles, Inc.*, 754 F.2d 1524, 1529 (9th Cir. 1985) (citing *Montana v. United States*, 440 U.S. 147, 153–54 (1979)). *Res judicata* involves two doctrines: claim preclusion and issue preclusion. The Ninth Circuit has distinguished the preclusion doctrines as follows:

> Under claim preclusion, a final judgment on the merits of a claim bars subsequent litigation of that claim. Claim preclusion prevents litigation of all grounds for, or defenses to, recovery that were previously available to the parties, regardless of whether they were asserted or determined in the prior proceeding. The related doctrine of issue preclusion, or collateral estoppel, bars relitigation, even in an action on a different claim, of all issues of fact or law that were actually litigated and necessarily decided in the prior proceeding.

*Id.* (internal citations and quotations omitted).

"When the same claim or issue is litigated in two courts, the second court to reach judgment should give *res judicata* effect to the judgment of the first, regardless of the order in which the two actions were filed." *Id.* (citing *Chicago, R.I. & P. Ry. v. Schendel*, 270 U.S. 611, 615–17 (1926)). Federal courts apply federal *res judicata* rules to judgments issued by other federal courts. *Robi*, 838 F.2d at 322. However, the Full Faith and Credit Act, 28 U.S.C. § 1738, requires federal courts to apply the *res judicata* rules of a particular state to judgments issues by courts of that state. *Id.* (citing *Parsons Steel, Inc. v. First Alabama Bank*, 474 U.S. 518, 519 (1986)).

## B.     Mr. Stuart Cannot Prosecute his *Monell* Claim Under Count Nine Due to Claim Preclusion

Defendants' first *res judicata* argument is that Judge Teilborg's Summary Judgment Order dismissing Mr. Stuart's *Monell* claim in *Stuart II* is preclusive of Count Nine in this case. (Doc. 282 at 4–7). Count Nine alleges a *Monell* claim against the City, Mayor Lane, and Attorney Washburn. To prevail on a *Monell* claim, "civil rights plaintiffs suing a municipal entity under [Section] 1983 must show that their injury was caused by a

municipal policy or custom." *Los Angeles County v. Humphries*, 562 U.S. 29, 30–31 (2010).  A municipal policy is "a deliberate choice to follow a course of action . . . by the official or officials responsible for establishing final policy with respect to the subject matter in question." *Pembaur v. City of Cincinnati*, 475 U.S. 469, 483 (1986).  Liability can attach under *Monell* in three circumstances.  First, a municipality may be liable "when implementation of its official policies or established customs inflicts the constitutional injury." *Monell*, 436 U.S. at 708.  A plaintiff can also prevail by showing certain acts of omission by a local government, such as a pervasive failure to train municipal employees, but only "when such omissions amount to the local government's own official policy." *Clouthier v. Cty of Contra Costa*, 591 F.3d 1232, 1249 (9th Cir. 2010), *overruled on other grounds in Castro v. Cty. of Los Angeles*, 833 F.3d 1060 (9th Cir. 2016).  Finally, a city "may be held liable under [Section] 1983 when 'the individual who committed the constitutional tort was an official with final policy-making authority' or such an official 'ratified a subordinate's unconstitutional decision or action and the basis for it.'" *Id.* at 1250 (quoting *Gillette v. Delmore*, 979 F.2d 1342, 1346–47 (9th Cir. 1992)) (internal quotation marks and citations omitted)).

Defendants maintain that the same allegations, facts, and evidence that partly underpins Mr. Stuart's prior *Monell* claim are the same as those that underpin Count Nine. (Doc. 282 at 5).  They argue Mr. Stuart cannot escape claim preclusion by reframing the same series of facts under different legal theories.  (*Id.* at 6 (citing Restatement (Second) of Judgments § 24)).  Defendants further contend that Mr. Stuart could have vindicated his claims for retaliatory arrest and first amendment violations in *Stuart II*, and his choice not to does not impair its preclusive effect.  (Doc. 313 at 9–10).  Mr. Stuart argues the *Monell* claims are not identical and that factual issues regarding the City's policies at the February Meeting and Mr. Stuart's arrest were never litigated in *Stuart II*.  (Doc. 299 at 6). The Court agrees with Defendants.

### 1.     The Claim Preclusion Doctrine

Claim preclusion "prevents litigation of all grounds for, or defenses to, recovery that

1   were previously available to the parties, regardless of whether they were asserted or

2   determined in the prior proceeding.'" *Robi*, 838 F.2d at 322 (quoting *Brown v. Felsen*, 442

3   U.S. 127, 131 (1979)).  In other words, claim preclusion does not only apply to "questions

4   essential to and actually litigated in the first action"; rather it "bar(s) all grounds for

5   recovery which could have been asserted, whether they were or not, in a prior suit between

6   the same parties . . . on the same cause of action."  *Costantini v. Trans World Airlines*, 681

7   F.2d 1199, 1201 (9th Cir. 1982) (quoting *Ross v. IBEW*, 634 F.2d 453, 457 (9th Cir. 1980)).

8        Because Mr. Stuart's prior *Monell* claim was litigated in federal court, "the Court

9   does not apply Arizona's liberal 'same evidence'[12] test when assessing the *res judicata*

10  effect . . . . Instead, federal law applies."  *McGhee v. High Mt. Health LLC*, 2020 WL

11  1929186, *5 (D. Ariz. Apr. 21, 2020) (citing *Axon Enterprise Inc. v. Vievu LLC*, 2018 WL

12  317289, *3 (D. Ariz. 2018) ("[F]ederal courts apply the transactional test to determine the

13  *res judicata* effect of a prior federal judgment, but defer to state *res judicata rules* when

14  evaluating the preclusive effect of a state court judgment.")).  Claim preclusion applies

15  under federal law when "the earlier suit . . . (1) involved the same 'claim' or cause of action

16  as the later suit, (2) reached a final judgment on the merits, and (3) involved identical

17  parties or privies."  *Sidhu v. Flecto Co.*, 279 F.3d 896, 900 (9th Cir. 2002).  The Court will

18  address each element in turn.

19                    **2.    The Claim Preclusion Elements**

20                    **a.    Identity of Claims**

21        To determine whether two suits involve the same claim or cause of action under the

22  first claim preclusion element, courts must consider four criteria: "(1) whether the two suits

23  arise out of the same transactional nucleus of facts; (2) whether rights or interests

24  established in the prior judgment would be destroyed or impaired by prosecution of the

25  second action; (3) whether the two suits involve infringement of the same right; and (4)

26  whether substantially the same evidence is presented in the two actions."  *Mpoyo v. Litton*

---

27  [12] "The 'same evidence' test is quite liberal, and permits a plaintiff to avoid preclusion

28  merely by posturing the same claim as a new legal theory, even if both theories rely on the
    same underlying occurrence."  *Power Rd.-Williams Field LLC v. Gilbert*, 14 F. Supp. 3d
    1304, 1309 (D. Ariz. 2014).

*Electro-Optical Sys.*, 430 F.3d 985, 987 (9th Cir. 2005).  The Ninth Circuit has instructed that these considerations are "tools of analysis, not requirements."  *Int'l Union of Operating Engineers-Emps. Const. Indus. Pension, Welfare & Training Tr. Funds v. Karr*, 994 F.2d 1426, 1429–30  (9th Cir. 1993) (quoting *Derish v. San Mateo–Burlingame Bd. of Realtors*, 724 F.2d 1347, 1349 (9th Cir. 1983)).

> **i.**  **Whether *Stuart II* arose out of the same transactional nucleus of facts as Count Nine**

Under the first consideration, "[w]hether two suits arise out of the same transactional nucleus depends upon whether they are related to the same set of facts and . . . could conveniently be tried together."  *Proshipline Inc. v. Aspen Infrastructures Ltd*, 609 F.3d 960, 968 (9th Cir. 2010).  This inquiry "is essentially the same as whether the claim *could have been brought* in the first action."  *Turtle Island Restoration Network v. U.S. Dep't of State*, 673 F.3d 914, 918 (9th Cir. 2012) (internal quotation omitted) (emphasis added).  The Ninth Circuit has "often held the common nucleus criterion to be outcome determinative."  *Mpoyo*, 430 F.3d at 988.  Mr. Stuart argues his *Monell* claim in *Stuart II* is entirely different because it focused on the defendants' decision to garnish community assets, while Count Nine focuses on Defendants' decisions to prohibit Mr. Stuart from speaking at the February Meeting.  (Doc. 299 at 5–6).  The Court is unconvinced.

Mr. Stuart is accurate that the primary focus of his *Monell* claim in *Stuart II* was the defendants' application for a writ of garnishment.  *Stuart II*, ECF. No. 93 at ¶¶ 108–126.  However, that *Monell* claim was also predicated on a lengthy list of examples spanning from February 2017–November 2019 in which Mr. Stuart believed the defendants carried out policies and procedures that violated Mr. Stuart's constitutional, equal protection, and due process rights.  *Stuart II*, ECF. No. 93 at ¶¶ 127–160 ("Other examples of the execution of these [defendants'] equal protection and due process violations policies are numerous").  Among those examples, Mr. Stuart alleged the following:

In February 2017, Washburn, Lane, and Scottsdale caused [Mr. Stuart] to be

1
2
3
4
5
6

arrested and prohibited him from speaking at open public comment in a city council meeting about unconstitutional speech practices utilized by Scottsdale. Scottsdale's actions against Mark Stuart had already been ruled unconstitutional as unlawful prior restraints on speech and unlawful content-based restrictions on speech by the Arizona and U.S. Supreme Courts many years prior to 2017. Arresting Stuart and prohibiting him from speaking is an example of the implementation of Scottsdale's equal protection and due process violations.

7
8
9
10

*Id.* at ¶¶ 132–133. Mr. Stuart claimed that in doing so, the defendants "have condoned and sanctioned a policy and custom of retaliation using City resources against those like the Stuarts that exercise their federal constitutional rights vis-à-vis the city of Scottsdale." *Id.* at ¶ 152.

11
12
13
14
15
16
17
18
19
20

In comparison, the *Monell* claim under Count Nine is based on Mr. Stuart's allegations spanning from October 2016–June 2017 that purportedly show Defendants "conspired together to chill Stuart's speech culminating with his arrest for trespassing at a Scottsdale City Council meeting" on February 7, 2017. (Doc. 5 at ¶¶ 27–76). Count Nine claims that Mr. Stuart's efforts to speak at the February Meeting and subsequent arrest demonstrate he "was subjected to retaliatory conduct by law enforcement and other Scottsdale employees and agents, was prosecuted criminally with no evidence to support the charges, with an unconstitutional motive, and without probable cause, equal protection or due process in an attempt to chill Mr. Stuart's free speech, and to intimidate, harass, and exact revenge for prior exercises of free speech and assembly in Scottsdale." (*Id.* at ¶ 163).

21
22
23
24
25
26
27
28

It is readily apparent that Count Nine—although based on additional facts and slightly different theories of constitutional violations—relies on the same nucleus of facts that partly underpinned Mr. Stuart's *Monell* claim in *Stuart II*. Both claims raise the same events that occurred at the same February Meeting to assert the defendants' had a custom of retaliating against Mr. Stuart when he sought to exercise his free speech rights. *Compare Stuart II*, ECF. No. 93 at ¶¶ 132–133, 152 *with* (Doc. 5 at ¶¶ 150–166). Because this suggests both claims could have been tried together, the same transactional nucleus requirement is met. *See Turtle Island*, 673 F.3d at 918; *Proshipline*, 609 F.3d at 968. The

Court further agrees with Defendants that "[t]he fact that [Mr. Stuart] may not have focused on particular facts . . . in *Stuart II* is irrelevant—it is instead the *opportunity* to reach the merits of a particular allegation that gives rise to their preclusive effect." (Doc. 313 at 9 (citing *Clark v. Yosemite Cmty. Coll. Dist.*, 785 F.2d 781, 786 (9th Cir. 1986)). Indeed, claim preclusion "bar(s) all grounds for recovery which could have been asserted, whether they were or not, in a prior suit between the same parties . . . on the same cause of action." *Costantini*, 681 F.2d at 1201. This first consideration is therefore conclusive of preclusive effect.

> ### ii. Whether the rights and interests established in *Stuart II* would be impaired by prosecution of Count Nine

Under the second consideration, Defendants argue it "would destroy the Court's determination in *Stuart II* that Bruce Washburn and Mayor Lane are entitled to qualified immunity to strip them of that established immunity in this case." (Doc. 282 at 5). Mr. Stuart disagrees, contending that Judge Teilborg granted qualified immunity specifically for a garnishment that occurred against Mr. Stuart in May 2019, not for Mr. Stuart's arrest at the February Meeting. (Doc. 299 at 5). Mr. Stuart further argues that Judge Teilborg's finding that Attorney Washburn lacked final policymaking authority was limited to his actions when seizing Mr. Stuart and his wife's assets and does not apply to his actions when allegedly preventing Mr. Stuart from speaking at the February Meeting. (*Id*. at 6).

Mr. Stuart's first point is well taken. Indeed, Judge Teilborg's grant of qualified immunity to Mayor Lane and Attorney Washburn was based on the conclusion "that [the Stuarts] have failed to demonstrate a violation of clearly established law which Defendants should have been aware of at the time of garnishment [of their community property]." *Stuart II*, ECF. No. 119 at 10. In this context, Mayor Lane and Attorney Washburn's right to qualified immunity does not equate to their alleged conduct under Count Nine. Therefore, prosecution of Count Nine would not impair the qualified immunity rights

established as to Mayor Lane and Attorney Washburn in *Stuart II*.[13]   However, as to

Mr. Stuart's second point, Judge Teilborg's Summary Judgment Order ultimately held that

Attorney Washburn did not serve as the final policymaker for the City because "*[a]ll City

Attorney's actions* are reviewable by the City Council."   *Stuart II*, ECF No. 151 at 8

(emphasis added).   To proceed with Count Nine in this matter against Attorney Washburn

may impair that established interest.   This second consideration is therefore inconclusive

of preclusive effect.

### iii.   Whether *Stuart II* involved infringement of the same rights in Count Nine

Under the third consideration, the *Monell* claim in *Stuart II* and the *Monell* claim

under Count Nine involve infringement of some—but not all—of the same rights.   In

*Stuart II*, Mr. Stuart broadly alleged infringement of his constitutional, equal protection,

and due process rights to support his *Monell* claim.   *Stuart II*, ECF. No. 93 at ¶¶ 108–160.

In Count Nine, Mr. Stuart broadly alleges infringement of his constitutional rights under

the First, Fourth, Fifth, and Fourteenth Amendments.   (Doc. 5 at ¶¶ 150–166).   Because

both of Mr. Stuart's actions involve vast and over-inclusive legal theories of infringement,

whether they involve infringement of the same rights is less clear.   At minimum, however,

both *Monell* claims expressly alleged infringement of Mr. Stuart's equal protection or due

process rights as a result of the defendants' actions at the February Meeting.   *Compare

Stuart II*, ECF. No. 93 at ¶ 133 (claiming that the defendants' "[a]rresting Mr. Stuart and

prohibiting him from speaking [at the February Meeting] is an example of the

implementation of Scottsdale's equal protection and due process violations")) *with* (Doc.

5 at ¶ 163 (alleging that Mr. Stuart's efforts to speak at the same February Meeting and

subsequent arrest demonstrate he "was prosecuted criminally . . . without probable cause,

equal protection or due process in an attempt to chill Mr. Stuart's free speech, and to

intimidate, harass, and exact revenge for prior exercises of free speech and assembly in

---

[13] To the extent Defendants seek to argue Judge Teilborg's determination of qualified immunity is dispositive of the issue of qualified immunity in this case, such an argument would arise under the issue preclusion doctrine, not the claim preclusion doctrine.

Scottsdale")).  This third consideration is therefore inconclusive of preclusive effect but leans toward a finding that similar rights were at issue.  *See McGhee*, 2020 WL 1929186, *5 (finding the third consideration " 'not conclusive' in a similar case because, although the plaintiff alleged that the 'same overall harms and primary rights' were at issue, the plaintiff's assertion of different legal theories presented 'different particular rights' ") (quoting *Myopo*, 430 F.3d at 987).

### iv.   Whether there is overlap in evidence

Under the fourth consideration, *Stuart II* appears to rely on different evidence than Count Nine (*e.g.*, the garnishment of Mr. Stuart and his wife's joint bank account). Nonetheless, some evidentiary overlap exists.  For example, to oppose the defendants' motion for summary judgment in *Stuart II*, Mr. Stuart submitted a sworn declaration stating "Scottsdale arrested me in Feb. 7, 2017 to prevent me from speaking at a city council meeting about city policies and actions that violated peoples [sic] free speech rights. . . . I stopped exercising my free speech rights because of this harassment."  *Stuart II*, ECF No. 139-2 at ¶ 26.  Mr. Stuart further cited to his "testimony about harassment and arrests by Scottsdale employees in traditional public forums because of his identity and the content of his speech."  *Id*. at 11 (citing *Id*., ECF No. 139-8 at 1–2 (" . . . . me from speaking in the city council meeting, there had been a number of interactions between myself and city employees and the -- and Scottsdale police who were harassing me while I was out raising public awareness about this ballot initiative. And so it culminated with the arrest")).  This last consideration is therefore inconclusive of preclusive effect.

### v.   Conclusion

The first consideration warrants preclusive effect while the second, third, and fourth considerations are inconclusive.  However, the finding that the *Monell* claim in *Stuart II* and the *Monell* claim under Count Nine share a common nucleus of operative fact is "outcome determinative under the first *res judicata* element."  *Myopo*, 430 F.3d at 988 (citing *Karr*, 994 F.2d at 1429–30 (holding the same nucleus of operative fact consideration to be outcome determinative and listing cases relying on the consideration as the exclusive

factor to bar a second claim under *res judicata*)).  The Court will therefore proceed to the final claim preclusion elements.

### b.      Final Judgment on the Merits

Judge Teilborg's Summary Judgment Order dismissing the *Monell* claim in *Stuart II* satisfies the second claim preclusion element because "a summary judgment dismissal [] is considered a decision on the merits for res judicata purposes."  *Id.* (citing *Hells Canyon Pres. Council v. U.S. Forest Serv.*, 403 F.3d 683, 686 (9th Cir. 2005)).

### c.      Identical Parties or Privies

The final claim preclusion element assesses privity between the parties.  Mr. Stuart is the same Plaintiff in both actions.  As to the defendants, both *Monell* claims were brought against the City, Mayor Lane, and Attorney Washburn in their individual and official capacities.  *Compare Stuart II*, ECF No. 93 at ¶¶ 12, 109–117, 132 *with* (Doc. 5 at ¶¶ 11, 15, 150–166).  Therefore, it is certain that the City, Mayor Lane, and Attorney Washburn are identical parties who already had a complete opportunity to defend against Mr. Stuart's *Monell* claim in *Stuart II* through the same capacities as they are sued in the present action under Count Nine.  This supports application of *res judicata*.  *Tahoe-Sierra Pres. Council, Inc.v. Tahoe Reg'l Planning Agency*, 322 F.3d 1064, 1081 (9th Cir. 2003) ("[S]everal parties in both actions are identical, and therefore quite obviously in privity.").

### 3.      The Claim Preclusion Policies

All three claim preclusion elements require applying *res judicata*.  Mr. Stuart's insinuation that the *Monell* claim in *Stuart II* was limited to the defendants' garnishment of Mr. Stuart's community assets is tantamount to Mr. Stuart asking the Court to view *Stuart II* in a vacuum.  Upon review of the *Stuart II* record, Mr. Stuart asserted a *Monell* claim based in part on identical allegations in the present matter—that the defendants' conduct and effectuated arrest at the February Meeting amounted to a custom, pattern, practice, or policy of violating Mr. Stuart's constitutional rights.  *Stuart II*, ECF No. 93 at ¶¶ 132–33, 152.  That claim proceeded through discovery and dispositive motions, and Mr. Stuart defended on summary judgment, arguing "Scottsdale has a

pervasive practice of violating the due process rights of persons who are peacefully exercising their free speech rights in traditional public forums in Scottsdale." *Id*., ECF. No. 139 at 8.  For support, Mr. Stuart submitted his sworn testimony "about harassment and arrests by Scottsdale employees in traditional public forums because of his identity and the content of his speech," which specifically concerned his arrest at the February Meeting. *Id*., ECF Nos. 139 at 11; 139-2 at ¶ 26; 139-8 at 1–2.

Despite Mr. Stuart's efforts, Judge Teilborg held that the only cognizable *Monell* claim supported by any evidence at all was one that "ar[o]se from Scottdale's attempted garnishment of Mr. Stuarts' bank account and failure to provide notice to [Mr. Stuart's wife] of its intent to seize her property."  *Id*., ECF. No. 151 at 6. Judge Teilborg expressly recognized that Mr. Stuart also included allegations relating to First Amendment violations and wrongful arrest at the February Meeting, but nonetheless found Mr. Stuart had put forth nothing to support those claims:

> Even if Mr. Stuarts showed a constitutional violation, they have failed to produce any evidence that Scottsdale had a custom, pattern, practice, or policy of violating constitutional rights. Mr. Stuarts argue that Scottsdale has a history of unconstitutional practices, citing to his past interactions with Scottsdale as well as lawsuits filed by past Scottsdale employees.

> But this evidence consists solely of allegations. None of the provided evidence has a final judgment showing that constitutional violations indeed happened. Moreover, with respect to the provided evidence, the allegations—*free speech and wrongful termination [(arrest)]*—are distinct from an unreasonable seizure or due process claim. It is unclear how these allegations support that Scottsdale has a practice of violating individual's Fourth and Fourteenth Amendment rights.

*Id*. at 6–8 (internal citations omitted) (emphasis added).  Mr. Stuart had the opportunity to prove those claims up on summary judgment, but failed to do so.  When ultimately holding that "[Mr. and Mrs. Stuart] have failed to show that Scottsdale had a custom, pattern, practice, or policy of violating constitutional rights," Judge Teilborg's Summary Judgment Order necessarily disposed of Mr. Stuart's allegations regarding the February Meeting. *Id*. at 8.  And it matters not that Mr. Stuart filed his *Monell* Claim in *Stuart II* after the

*Monell* claim under Count Nine.  *See Americana Fabrics*, 754 F.2d at 1529 ("When the same claim or issue is litigated in two courts, the second court to reach judgment should give *res judicata* effect to the judgment of the first, regardless of the order in which the two actions were filed.").

*Res judicata* "is motivated primarily by the interest in avoiding repetitive litigation, conserving judicial resources, [] preventing the moral force of court judgments from being undermined" and "properly avoid[ing] piecemeal litigation."  *Karr*, 994 F.2d at 1431. These underlying policies prevent the exact type of litigation Mr. Stuart seeks to maintain, and the Court will not allow Mr. Stuart a second bite of the apple.  *Tahoe Sierra*, 322 F.3d at 1078 ("Newly articulated claims based on the same nucleus of facts may still be subject to a *res judicata* finding if the claims could have been brought in the earlier action."). Accordingly, the Court will enter summary judgment on Count Nine in favor of the City, Mayor Lane, and Attorney Washburn due to claim preclusion.

## C.    Mr. Stuart Cannot Prosecute his First Amendment Interference Claim Under Count Two Due to Issue Preclusion

Defendants' second *res judicata* argument is that Count Two fails due to collateral estoppel.  (Doc. 282 at 7–10).  Count Two alleges the Individual Defendants interfered with Mr. Stuart's protected First Amendment activity and wrongfully arrested him for exercising his free speech rights at the February Meeting.  (Doc. 5 at ¶¶ 90–95).  *See also Stuart v. City of Scottsdale*, 2022 WL 1769783, at *1 (9th Cir. June 1, 2022).  Thus, Mr. Stuart seeks to recover under two theories: First Amendment interference and First Amendment retaliatory arrest.

Defendants maintain that the State Court Judgment and Appeal Ruling[14] have

---

[14] Defendants also seek to rely on an April 12, 2018, Order issued by Encanto Justice Court Judge McMurry.  (*See* Doc. 282 at 25–32).  Mr. Stuart opposes, arguing that Order is not proper for collateral estoppel purposes because Judge McMurray was ultimately recused from the matter, the Order  was interlocutory, and the Order was overruled by the later bench trial.  (Doc. 299 at 7–8).  Mr. Stuart's representations cast doubt on whether the Order was "sufficiently firm" for collateral estoppel purpose. *See Luben*, 707 F.2d at 1040. Defendants have also not provided adequate documentation of the Encanto Justice Court docket for the Court to assess.  Therefore, the Court will not rely on the Encanto Justice Court Order for  purposes of this Order.

already settled material issues in Defendants' favor—specifically, that (1) Mr. Stuart was not engaged in any protected activity at the February Meeting and thus did not suffer constitutional infringement; and (2) probable cause existed to arrest Mr. Stuart for failing to obey an officer at the February Meeting.  (Doc. 282 at 7–10).  Defendants reason that application of these findings of fact and conclusions of law under collateral estoppel entitle them to summary judgment on Count Two.  Mr. Stuart argues Defendants have not submitted adequate portions of the state court record to prove collateral estoppel.  (Doc. 299 at 7).  Mr. Stuart further contends the issues in the lower court appeal are not identical to this case, and he had no opportunity to present evidence showing that he was engaged in constitutionally protected free speech, subject to viewpoint discrimination, unlawfully excluded from the forum under the rules of public comment, and retaliated against for his speech, or arrested without probable cause.  (*Id*. at 8–10).

The Court will first set forth the standards for collateral estoppel.  The Court will then assess whether, and to what extent, collateral estoppel applies to Mr. Stuart's theories of recovery.

### 1.      The Issue Preclusion Doctrine

Collateral estoppel, or issue preclusion, "prevents a party from relitigating issues of fact or law" in order to promote judicial economy.  *Legacy Found. Action Fund v. Citizens Clean Elections Comm'n*, 524 P.3d 1141, 1148 (Ariz. 2023) (internal citations omitted).  "As long as a litigant had a full and fair opportunity to litigate the issue, collateral estoppel . .  based on state-court criminal proceedings applies to subsequent civil litigation under [Section] 1983."  *Scafidi v. Las Vegas Metro. Police Dep't*, 966 F.3d 960 (9th Cir. 2020) (citing *Allen v. McCurry*, 449 U.S. 90, 97–99 (1980)).  Because the Individual Defendants' collateral estoppel theory is based on Arizona state court proceedings, Arizona *res judicata* law applies.  *See Robi*, 838 F.2d at 322.  In any event, "Arizona courts apply the same issue preclusion test as federal courts." *Quinn v. Cardenas*, 535 P.3d 921, 928 (Ariz. Ct. App. 2023).

When asserted defensively, as here, collateral estoppel applies when "(1) the issue

1    at stake is the same in both proceedings; (2) the issue was actually litigated and determined
2    in a valid and final judgment issued by a tribunal with competent jurisdiction; (3) the
3    opposing party had a full and fair opportunity to litigate the issue and actually did so; and
4    (4) the issue was essential to the judgment.  *Legacy*, 524 P.3d at 1148 (citing *Chaney Bldg.*
5    *Co. v. Tucson*, 716 P.2d 28, 30 (1986)); *see also Seyed Mohsen Sharifi Takieh v. Banner*
6    *Health*, 515 F. Supp. 3d 1026 (D. Ariz. 2021).  An issue is "actually litigated" for collateral
7    estoppel purposes when it is "is properly raised by the pleadings or otherwise, and is
8    submitted for determination, and is determined[.]"  *Chaney*, 716 P.2d at 30.  Furthermore,
9    "[a] 'final judgment' for purposes of collateral estoppel can be any prior adjudication of an
10   issue in another action that is determined to be 'sufficiently firm' to be accorded conclusive
11   effect."  *Luben Indus., Inc. v. United States*, 707 F.2d 1037, 1040 (9th Cir. 1983).

12                    **2.      First Amendment Interference**

13          Count Two alleges that Defendants interfered with Mr. Stuart's First Amendment
14   rights in violation of Section 1983 when they prevented him from speaking at the February
15   Meeting.  (Doc. 5 at ¶¶ 90–95).  To prevail in a civil action under Section 1983, "the
16   plaintiff must show that the conduct complained of deprives him of some right, privilege,
17   or immunity protected by the Constitution or federal law."  *Gagic v. Cnty. of Maricopa*,
18   2021 WL 1264006, at *2 (D. Ariz. Apr. 6, 2021), *aff'd*, 2021 WL 6102183 (9th Cir. Dec.
19   22, 2021) (citing *Albright v. Oliver*, 510 U.S. 266, 271 (1994)).  "[T]he First Amendment
20   means that government generally has no power to restrict expression because of its
21   message, its ideas, its subject matter, or its content."  *Barr v. Am. Ass'n of Pol. Consultants,*
22   *Inc.*, 140 S. Ct. 2335, 2347 (2020) (internal quotations and citations omitted).  However,
23   governments may impose "reasonable time, place, or manner" restrictions on protected
24   speech depending on the forum in which the speech takes place.  *See Kindt v. Santa Monica*
25   *Rent Control Bd.*, 67 F.3d 266, 269–271 (9th Cir. 1995) (explaining the "three recognized
26   categories of permissible regulation of expressive activity").  The Ninth Circuit has
27   recognized that "city council meetings, once open to public participation, are limited public
28   forums."  *Norse v. City of Santa Cruz*, 629 F.3d 966, 975 (9th Cir. 2010).  "In a limited

public forum, restrictions that are viewpoint neutral and reasonable in light of the purpose served by the forum are permissible." *DiLoreto v. Downey Unified Sch. Dist. Bd. of Educ.*, 196 F.3d 958, 964 (9th Cir. 1999) (citing *Rosenberger v. Rector & Visitors of the Univ. of Virginia*, 515 U.S. 819, 829, (1995)).

Mr. Stuart argues there are factual disputes about whether he was subject to viewpoint discrimination when he was prevented from speaking at the February Meeting and ordered removed. (Doc. 298 at 14–17). He contends a reasonable juror could find that Mayor Lane acted with discriminatory motive. For example, Mr. Stuart argues the evidence shows Mr. Stuart and Mayor Lane had "diametrically opposed views on free speech and the DDC" and a "very antagonistic relationship." (*Id*. at 15, 16). Mr. Stuart further argues Mayor Lane's pretext was that Mr. Stuart's speech was not within the jurisdiction of the City Council under the Open Meeting Law. (*Id*. at 16).

Defendants argue Mr. Stuart cannot prevail because the Appeal Ruling determined that the "City of Scottsdale did not violate the [Mr. Stuart's] First Amendment rights when it prevented [him] from presenting information during the public comment period at the February 7, 2017 City Council Meeting." (Doc. 282 at 8) (internal quotations and citations omitted). They further contend the Appeal Ruling settled that "the refusal to allow Stuart to urge support at a city council meeting for what was a political issue and to solicit volunteers to join the effort was both reasonable and viewpoint-neutral." (Doc. 313 at 6 (quoting Doc. 282 at 92)). Defendants point to examples in the state court proceedings where Mr. Stuart had a full and fair opportunity to argue that his prohibition of speech at the February Meeting was an impermissible restraint on his right to speak under the United States and Arizona constitutions. (Doc. 282 at 8). Defendants urge that Mr. Stuart's First Amendment infringement claim must fail for these reasons.

The question is whether the Appeal Ruling precludes Mr. Stuart from disputing whether he was subject to unlawful speech restrictions at the February meeting under Count Two. The Court will examine each collateral estoppel element in turn.

///

### a.    Whether the issue at stake is the same in both proceedings

First, Mr. Stuart argues that the speech restriction issue in this case is distinct because it is limited to "whether Lane prevented plaintiff from speaking and had him removed from the council meeting based on viewpoint discriminatory motives." (Doc. 299 at 9).  But this same issue was at stake in the Appeal Ruling.  The Appeal Ruling summarized Plaintiff's "principal" argument: "[T]he refusal to allow Stuart to speak at the [February 7, 2017] city council meeting was an impermissible government-imposed prior restraint in violation of his right to speak under the United States and Arizona constitutions."  (Doc. 282 at 89).  Because speech restrictions in public forums must be viewpoint neutral and reasonable in light of the circumstances, the question of whether Mr. Stuart was prevented from speaking due to viewpoint discriminatory motives was at stake in the Appeal Ruling.  This first collateral estoppel element is met.

### b.    Whether the issue was actually litigated

Second, the speech restriction issue was actually litigated before the Superior Court. The Appeal Ruling settled material issues of fact regarding Mr. Stuart's SOP presentation and the exchange between Mayor Lane and Mr. Stuart at the February Meeting :

> [A] reasonable person could view the materials that Stuart identified as his "presentation" to the city council as signaling an intent to deliver what amounted to a campaign speech in support of his election initiative.
>
> . . . .
>
> [T]he record can be reasonably viewed to establish that, when Lane advised Stuart that he would be permitted "to speak about something other than" his election initiative, Stuart refused the invitation.  He did not say, for example, that he had a written petition to submit, much less did he attempt to submit a written petition.   Nor did Stuart say that he wanted to speak about Washburn's purported disregard for his (Stuart's) constitutional rights, which Stuart's brief now maintains (at 7, para. 15) is a subject about which he was denied an opportunity to speak.  Instead, the record establishes that, when Lane explained to Stuart that he would be allowed to speak about anything other than urging support for his election initiative, Stuart insisted on speaking about that initiative anyway.  Only then did Lane ask Stuart to step away from the podium.

(*Id*. at 85–86).  The Appeal Ruling further held that the refusal to allow Stuart to speak at the February meeting was a viewpoint neutral restriction on his speech, and that his removal was reasonable in light of the circumstances:

> The record here establishes that the refusal to allow Stuart to speak in support of his election initiative was driven exclusively by the limit that A.R.S. §38-431.01(H) imposes.  Other than Stuart's self-interested protests to the contrary, nothing in the record suggests that the city's desire to comply with applicable law was unreasonable.  And, as explained [], the record also establishes that the refusal to allow Stuart to speak was not driven because of a disagreement with the substance of what Stuart wanted to say.  In other words, in the circumstances of this case, the refusal to allow Stuart to urge support at a city council meeting for what was a political issue and to solicit volunteers to join the effort was both reasonable and viewpoint-neutral.

> The Stuart brief seems to assume that, merely because Stuart wished to utter words, his proposed speech had content, and thus, to deny him the opportunity to speak those words was an impermissible content-based speech restriction.  The issue, however, is not whether a speaker had something to say: the issue is "whether the government has adopted a regulation of speech because of disagreement with the message it conveys." *Ward v. Rock Against Racism*, 491 U.S. 781, 791 (citation omitted)).  "[A] regulation is generally 'content-neutral' if its restrictions on speech are not based on disagreement" with the substance of the message. *Brazos Valley Coalition for Life, Inc. v. City of Bryan, Tex.*, 421 F.3d 314, 326–27 (5th Cir. 2005) (citations and footnote omitted); *accord Kokinda*, 497 U.S. at 730 (regulation of speech activities "for nonpublic for a . . . must be reasonable and 'not an effort to suppress expression merely because public officials oppose the speaker's view'" (quoting *Perry*, 460 U.S. at 46)); *DeGrassi v. City of Glendora*, 207 F.3d 636, 645-46 (9th Cir. 2000) (stating that city councils "may confine their meetings to specified subject matter . . . as long as the regulation on speech is reasonable and not an effort to suppress expression merely because public officials oppose the speaker's view" (citation and internal quotation marks omitted)); *see also Heffron*, 452 U.S. at 649 (concluding that anti-solicitation ordinance was content-neutral because it was "applie[d] evenhandedly to all").

> The Stuart brief identifies no evidence establishing that he was not allowed to speak in favor of, and solicit support for, his election initiative because Lane, Washburn, or anyone else was opposed to that initiative.  Indeed, all evidence is to the contrary.  Lane stated at the council meeting that statements from anyone about a political issue, "whether it's for or against," would not

be permitted, and he went on to say that "neither side" of "an effort to influence an election" would be allowed to speak.   [City of Scottsdale, Closed Caption Transcript (2/7/17) at 8–9].

. . . .

Finally, "[t]here is a significant governmental interest in conducting orderly, efficient meetings of public bodies."  *Rowe v. City of Cocoa, Fla.*, 358 F.3d 800, 803 (11th Cir. 2004).  Like judges in their courtrooms, Lane had a duty to maintain decorum in council meetings by ordering disruptive individuals to leave immediately.  *E.g.*, *Jones*, 888 F.2d at 1333 ("[T]o deny the presiding officer the authority to regulate irrelevant debate and disruptive behavior at a public meeting . . . would cause such meetings to drag on interminably, and deny others the opportunity to voice their opinions").  Because Stuart was not denied a constitutional right to speak, his conduct at the council meeting became disruptive, and citizens who disrupt public meetings may be removed without infringing on their constitutional rights.  *E.g.*, *Norwalk*, 900 F.2d at 1424, 1426 (recognizing that speakers may be subjected to restrictions when "their speech disrupts, disturbs or otherwise impedes the orderly conduct of the Council meeting" (internal quotation marks omitted)); *see also Norse*, 629 F.3d at 976 (describing Norwalk as holding that a city's "'Rules of Decorum' are not facially over-broad where they only permit a presiding officer to eject an attendee for actually disturbing or impeding a meeting").

(*Id*. at 92–95).  The Appeal Ruling's analysis demonstrates that the speech restriction issue was actually litigated before the Superior Court and determined in a valid and final judgment issued by a tribunal with competent jurisdiction.  Indeed, the Appeal Ruling affirmed Mr. Stuart's State Court Judgment, and any appeals of the Appeal Ruling thereafter was either affirmed or denied review.  *See Arizona v. Stuart*, No. 1 CA-CR 20-0620, 2021 WL 5571772 (Ariz. Ct. App. Nov. 30, 2021) *review denied* (June 3, 2022); *Stuart v. Arizona*, 143 S. Ct. 573 (2023).  The second collateral estoppel element is met.

### c.   Whether Mr. Stuart had a full and fair opportunity to litigate the issue

Third, Mr. Stuart argues he did not have any opportunity to present evidence of the viewpoint discrimination on appeal or evidence of the rules of public comment on appeal to prove he was unlawfully excluded from the form. (Doc. 299 at 9).  The Appeal Ruling's analysis plainly contradicts Mr. Stuart's position.  (*See* Doc. 282 at 93 ("The Stuart brief

identifies no evidence establishing that he was not allowed to speak in favor of, and solicit support for, his election initiative because Lane, Washburn, or anyone else was opposed to that initiative."),  89 n.11 ("Although the Stuart brief maintains, in effect, that he had what amounted to an unqualified right to speak during the open call to the public, that brief does not dispute that urging support, and soliciting volunteers to obtain signatures, for an election initiative was beyond the city council's jurisdiction.  *See* A.R.S. §38-431.01(H). Nor does the Stuart brief argue that the statute's restriction to 'any issue within the jurisdiction of the public body' is somehow unconstitutional."), 92 ("The Stuart brief seems to assume that, merely because Stuart wished to utter words, his proposed speech had content, and thus, to deny him the opportunity to speak those words was an impermissible content-based speech restriction.  The issue, however, is not whether a speaker had something to say: the issue is 'whether the government has adopted a regulation of speech because of disagreement with the message it conveys.'"), 93 ("Both in his brief and during the oral argument, Stuart insisted that the refusal to allow him to speak at the city council meeting must be subjected to strict scrutiny analysis.  In support of that contention, the Stuart brief relies on *Reed v. Town of Gilbert*, 576 U.S. 155 (2015). . . . Stuart also maintained during the oral argument that *Reed*, in effect, overruled all of those cases cited above, and others, in which a reasonable and viewpoint-neutral level of scrutiny was applied to speech restrictions in limited public and nonpublic forums.")).   Clearly Mr. Stuart had a full and fair opportunity to litigate the speech restriction issue and actually did so.  The third collateral estoppel element is met.

### d.  Whether the issue was essential to the judgment

Last, the speech restriction issue was essential to the Appeal Ruling's affirmance of Mr. Stuart's State Court Judgment.  Mr. Stuart argued he was "wrongfully convicted for failing to comply with a police Officer's order because the conviction arose out of the denial of his constitutional right to speak."  (*Id*. at 86).  The Appeal Ruling concluded that "[b]ecause Stuart was not denied a constitutional right to speak, his conduct at the council meeting became disruptive, and citizens who disrupt public meetings may be removed

without infringing on their constitutional rights." (*Id*. at 95).   This fourth collateral estoppel element is met.

Taken together, all collateral estoppel elements support a finding that the Appeal Ruling has already resolved the speech restriction issue in this case, which precludes Mr. Stuart from claiming Defendants interfered with First Amendment rights in at the February Meeting under Count Two.  So, the Court will enter summary judgment in Defendants' favor.

### 3.   First Amendment Retaliation

Count Two also alleges Defendants arrested Mr. Stuart without probable cause in retaliation against him for exercising his free speech rights at the February Meeting. (Doc. 5 at ¶¶ 90–95).   "[T]he First Amendment prohibits government officials from subjecting an individual to retaliatory actions for engaging in protected speech." *Nieves v. Bartlett*, 139 S. Ct. 1715, 1722 (2019) (quoting *Hartman v. Moore*, 547 U.S. 250, 256 (2006)) (internal quotations omitted).   The Ninth Circuit has clarified that actual infringement is not required in retaliation cases. *Blair v. Bethel Sch. Dist.*, 608 F.3d 540, 543 n.1 (9th Cir. 2010).  To recover for First Amendment retaliation, Mr. Stuart "must prove: (1) he engaged in constitutionally protected activity; (2) as a result, he was subjected to adverse action by the defendant that would chill a person of ordinary firmness from continuing to engage in the protected activity; and (3) there was a substantial causal relationship between the constitutionally protected activity and the adverse action." *Id*. at 543 (citing *Pinard v. Clatskanie School Dist. 6J*, 467 F.3d 755, 770 (9th Cir. 2006)). Upon Mr. Stuart's *prima facie* showing, the following framework applies:

> [T]he burden shifts to the defendant official to demonstrate that even without the impetus to retaliate he would have taken the action complained of.  If there is a finding that retaliation was not the but-for cause of the [adverse action], the claim fails for lack of causal connection between unconstitutional motive and resulting harm, despite proof of some retaliatory animus in the official's mind.

*Boquist v. Courtney*, 32 F.4th 764, 778 (9th Cir. 2022) (quoting *Hartman*, 547 U.S. at 260).

It is undisputed that Mr. Stuart's speech was restricted at the February Meeting and

he was arrested for trespassing thereafter, which are adverse actions that would chill a person of ordinary firmness under element two.  Defendants contend that Mr. Stuart cannot meet elements one and three because collateral estoppel applies to the Appeal Ruling's findings that Mr. was not engaged in protected activity at the February Meeting and there was probable cause for his arrest.  (Doc. 282 at 8–10).  The Court will analyze each element in turn.

### a.   *Prima Facie* Element One: Protected Speech

The first *prima facie* element requires Mr. Stuart to prove he was engaged in constitutionally protected activity.  *Blair*, 608 F.3d at 543.  Mr. Stuart argues his presentations on the SOP Initiative at the City Council Meetings were constitutionally protected free speech because "seeking redress of grievances and petitioning the city council is highly protected First Amendment activity." (Doc. 299 at 8).  Defendants argue Mr. Stuart cannot meet his *prima facie* showing because the state court determined the "City of Scottsdale did not violate the Defendant's First Amendment rights when it prevented the Defendant from presenting information during the public comment period at the February 7, 2017 City Council Meeting."  (Doc. 282 at 8).  Defendants reason this finding necessarily means "the state court has categorically determined that Mr. Stuart was not engaged in 'protected speech.'"  (*Id*. at 10 n.3).  The Court disagrees.

Whether Plaintiff was engaged in protective activity when attempting to present at the February Meeting was not at issue in the Appeal Ruling.  Although the Appeal Ruling settled that Mr. Stuart was not denied a constitutional right to speak at the February Meeting, *see supra* Sections III.C(2), that determination of a constitutional infringement is distinct from the determination of whether he engaged in protected speech. *See Blair*, 608 F.3d at 543 n.1 (clarifying that actual infringement is not required in retaliation cases).  The only direct ruling the Appeal Ruling made on protected activity was in the context of Mr. Stuart's failure to obey a police officer while outside the building.  (*See* Doc. 282 at 96 ("[A]t the moment Stuart refused to comply with what he was told to do, he was not engaged in any constitutionally protected activity.")).  That ruling concerned events that

took place outside of the February Meeting *after* Mr. Stuart was arrested and removed, and is therefore different from the protected speech asserted in this case.

Nonetheless, the Court agrees with Mr. Stuart that he was engaged in protected activity when attempting to present on the SOP Initiative.[15] Here, the Appeal Ruling settled that Mr. Stuart's intended presentation "amounted to a campaign speech in support of his election initiative," which necessarily pertains to an issue of public concern. (*Id.* at 85). And "speech on public issues occupies the 'highest rung of the hierarchy of First Amendment values,' and is entitled to special protection." *McKinley v. City of Eloy*, 705 F.2d 1110 (9th Cir. 1983) (quoting *N. A. A. C. P. v. Claiborne Hardware Co.*, 458 U.S. 886, 913 (1982)). By contrast, categories of unprotected speech include "obscenity, defamation, fraud, incitement, and speech integral to criminal conduct." *United States v. Osinger*, 753 F.3d 939, 946 (9th Cir. 2014). The Court therefore finds Mr. Stuart has met the first *prima facie* element.

### b.   *Prima Facie* Element Three: Causation

The third *prima facie* element requires Mr. Stuart to prove a causal relationship between his protected speech and the adverse actions he suffered at the February meeting. *Blair*, 608 F.3d at 543. "It is not enough to show that an official acted with a retaliatory motive and that the plaintiff was injured—the motive must cause the injury. . . . [I]t must be a 'but-for' cause, meaning that the adverse action against the plaintiff would not have been taken absent the retaliatory motive." *Nieves*, 139 S. Ct. at 1722 (citing *Hartman*, 547 U.S. at 259). When a plaintiff brings a retaliatory arrest claim, as here, the plaintiff must also show the "absence of probable cause." *Id.* at 1723–24; *Ballentine v. Tucker*, 28 F.4th 54, 61–62 (9th Cir. 2022). "Absent such a showing, a retaliatory arrest claim fails." *Nieves*, 139 S. Ct. at 1725. If the plaintiff meets his burden in both respects, then the defendants "can prevail only by showing that the arrest would have been initiated without respect to

---

[15] The finding that Mr. Stuart was engaged in protected speech is not inconsistent with the ruling that he was subject to constitutionally reasonable, and view-point neutral restriction at the February Meeting. *See supra* Section III.C(2). *Kindt*, 67 F.3d at 270 (explaining that at public meetings, even political speech may be restricted, so long as the restrictions are "reasonable and viewpoint neutral").

retaliation." *Id.*

Defendants contend Mr. Stuart has actively litigated the reasons behind his restricted speech and arrest before the state courts, and the state courts "determined that the City and those acting on its behalf fully complied with the Constitution[.]" (Doc. 282 at 9). Mr. Stuart argues he had no opportunity to present evidence of First Amendment retaliation on appeal. (Doc. 299 at 9). He posits the following theories of retaliatory motive: (1) Mayor Lane, Attorney Washburn, and Attorney Santaella took actions to suppress his speech at the February Meeting to retaliate against SOP Initiative presentations that Mr. Stuart delivered at the January Meetings; and (2) Officer Cleary and Officer Glenn retaliated against him when they arrested him without probable cause. The Court will address each of his theories in turn.

### i.       Speech Suppression

The first question is whether the state courts have already settled what motivated Mayor Lane, Attorney Washburn, and Attorney Santaella to suppress Mr. Stuart's speech at the February Meeting. Mr. Stuart argues the reason Attorney Washburn sent the Warning Letter, which Attorney Santaella forwarded to Officer Cleary, and Mayor Lane ordered Mr. Stuart removed from the February Meeting, was to retaliate against his prior efforts to speak about the SOP Initiative at the January Meetings. (Doc. 298 at 6). Mr. Stuart further alleges "[Mayor] Lane prevented Stuart from speaking because he did not want to hear what Stuart had to say." (*Id.*) For support, Mr. Stuart argues Mayor Lane favored building the DDC and had "diametrically opposed views" of free speech, and so prevented him from speaking at the February Meeting to suppress his views. (*Id.* at 4, 15). Defendants contend this Court must apply the state courts' determination that "there was absolutely no evidence that Mr. Stuart was not allowed to speak because anyone opposed his viewpoint." (Doc. 313 at 6). The Court agrees with Defendants.

As settled *supra*, Mr. Stuart is precluded from relitigating matters of viewpoint discrimination in this action because the Appeal Ruling already held he was subject to a lawful speech restriction. *See supra* Section III.C(2). In so holding, the Appeal Ruling

settled two pertinent issues: (1) Mr. Stuart was not precluded from speaking due to anyone's opposition of the SOP Initiative; and (2) Mr. Stuart was ordered removed from the February Meeting *due to disruptive conduct*.   (Doc. 282 at 93, 95); *see supra* Section III.C(2).  When applied to Mr. Stuart's First Amendment Retaliation claim here, these rulings directly undermine his ability to prove the content of his speech was the but-for cause of his speech suppression.  Indeed, the Appeal Ruling expressly held "the refusal to allow Stuart to speak in support of his election initiative was driven exclusively by the limit that A.R.S. §38-431.01(H) imposes," "not [] because of a disagreement with the substance of what Stuart wanted to say."  (Doc. 282 at 92); *see supra* Section III.C(2)(b). Moreover, the Appeal Ruling settled that "[Mayor] Lane had a duty to maintain decorum in council meetings by ordering disruptive individuals to leave immediately" and Mr. Stuart certainly became disruptive at the February Meeting.  (Doc. 282 at 95); *see supra* Section III.C(2).  Mr. Stuart is collaterally estopped from arguing otherwise.

The doctrine of issue preclusion prevents Mr. Stuart from reasserting that Mayor Lane, Attorney Washburn, and Attorney Santaella retaliated against him when they took action to suppress his speech at the February Meeting.  The Court will enter summary judgment accordingly.

### ii.   Arrest

The remaining question is whether the state courts have already settled what motivated Officer Cleary and Officer Glenn to arrest Mr. Stuart at the February Meeting. *See Nieves*, 139 S. Ct. at 1725.  To prevail on a retaliatory arrest claim, Mr. Stuart must show absence of probable cause in addition to the fact that he was arrested but-for the officers' retaliatory motive.  *Id*.  The determination of probable cause is based on the totality of the circumstances and "exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested." *Rodis v. City, Cnty. of San Francisco*, 558 F.3d 964, 969 (9th Cir. 2009) (quoting *United States v. Lopez*, 482 F.3d 1067, 1072 (9th Cir. 2007)).

Defendants argue this Court must afford preclusive effect to the state courts' determination that probable cause existed to arrest Mr. Stuart at the February Meeting. (Doc. 282 at 9–10).  For support, Defendants cite to four instances where the state courts denied Mr. Stuart's probable cause challenges:

> (1)   On March 3, 2017, Mr. Stuart filed a "Motion to Dismiss with Prejudice Pursuant to Ariz. Rule Crim. Proc. 16.6(B)" (*id*. at 53–55), which the Scottsdale City Court denied, *Arizona v. Stuart*, No. SC-2017003568 (Scottsdale City Ct. April 20, 2017).[16]

> (2)   On April 1, 2019, Mr. Stuart filed a "Motion to Dismiss the Charges for Lack of Probable Cause and Request for An Evidentiary Hearing to Prove Lack of Probable Cause" (Doc. 282 at 34–45), which the White Tanks Justice Court summarily denied in a minute entry on the basis that the right to a preliminary probable cause hearing is restricted to felony complaints, while Mr. Stuart was charged with misdemeanor offenses (*id*. at 76).

> (3)   On July 5, 2019 Mr. Stuart filed a "Second Request for Probable Cause Determination" (*id*. at 282 at 63–73), which the White Tanks Justice Court summarily denied (*id*. at 51, 78).

> (4)   On December 29, 2019, Mr. Stuart filed a "Third Motion to Dismiss" (*id*. at 57–61), which the Scottsdale City Court denied, *Arizona v. Stuart*, No. SC-2017003568 (Scottsdale City Ct. January 27, 2020).[17]

(Doc. 282 at 10).  Defendants reason that because Mr. Stuart's challenges were all denied, the state courts necessarily determined that probable cause existed.  (*Id*.)  Mr. Stuart opposes, arguing no state court has explicitly ruled that probable cause existed for his arrest for trespassing while at the podium.  (Doc. 299 at 9–10).  He contends his request for probable cause determinations were denied because he was not entitled to a probable cause hearing in misdemeanor proceedings.  (*Id*. at 10).  Mr. Stuart further maintains that that "motion[s] can be denied for a variety of procedural or other reasons" independent of

---

[16] Defendants did not provide a copy of the order denying Mr. Stuart's March 3, 2017, "Motion to Dismiss with Prejudice Pursuant to Ariz. Rule Crim. Proc. 16.6(B)."

[17] Defendants did not provide a copy of the order denying Mr. Stuart's December 29, 2019, "Third Motion to Dismiss".

substantive reasons.  (*Id*.)

While the parties do not cite any supporting authority for their propositions, the Court finds *Lovejoy v. Arpaio*, 2010 WL 466010 (D. Ariz. Feb. 10, 2010) instructive. There, the law enforcement defendants argued in Arizona district court that the plaintiff could not contest whether there was probable cause to arrest him because the issue was already litigated and decided in a prior state proceeding.  *Id*. at *4.  For support, the defendants pointed out that the plaintiff had filed a "Motion to Dismiss Complaint Based on Lack of Probable Cause" under to Ariz. Rule Crim. Proc. 16.6(B), to which the state court had summarily denied in a minute entry.  *Id*. at *5.  The district court ultimately found that plaintiff's challenge was insufficient to show the issue of probable cause was actually litigated and determined because: (1) "no witnesses were called and no evidence was presented;" (2) "the Arizona Rules of Criminal Procedure do not authorize [] court[s] to make [a probable cause] determination in a misdemeanor case" and restrict their ability to do so in felony cases; (3) "the state court's one line order [did] not explain why the motion was denied; and (4) "the [state] court did not make any finding of probable cause."  *Id*.

The circumstances in *Lovejoy* are instructive.  As he notes, Mr. Stuart was denied any probable cause hearing.  So, no witnesses were called and no evidence was presented on the issue.  In one instance, Mr. Stuart's request for a probable cause determination was dismissed because the right to a preliminary probable cause hearing is restricted to felony complaints.  (*See* Doc. 282 at 76).  The orders that are readily verifiable on the public record either show that Mr. Stuart's challenges were summarily denied or did not set forth any specific reasons for denial.  (*Id*. at 51, 78).  *See also Arizona v. Stuart*, No. SC-2017003568 (Scottsdale City Ct. Apr. 20, 2017); *Arizona v. Stuart*, No. SC-2017003568 (Scottsdale City Ct. January 27, 2020).  Defendants have not supplied any order explicitly finding that probable cause existed for Mr. Stuart's arrest.  Defendants therefore cannot establish that he fully and fairly litigated the issue of probable cause, that there was a valid and final decision on the merits, or that resolution of the issue was essential to the decision, as required by Arizona's issue preclusion rules.  *See Lovejoy*, 2010 WL 466010, at * 5;

*cf. Haupt v. Dillard*, 17 F.3d 285 (9th Cir. 1994), *as amended* (Apr. 15, 1994) (holding that a state court's express probable cause determination at a preliminary hearing was sufficient to preclude its relitigation).

Collateral estoppel therefore does not apply to preclude Mr. Stuart's retaliatory arrest claim on probable cause grounds.

### c.    Collateral Estoppel Conclusion

Although the issue preclusion doctrine prevents Mr. Stuart from arguing Defendants interfered with his First Amendment rights in this case, it does not preclude him from pursuing a First Amendment retaliatory arrest claim because no state court has decided whether he was arrested with probable cause. The Court must proceed to consider the Individual Defendants' arguments for qualified immunity.

### D.    The Individual Defendants are Entitled to Qualified Immunity

The Individual Defendants assert they cannot be held liable for any of Mr. Stuart's claims under the doctrine of qualified immunity. (*See generally* Doc. 251). "In [Section] 1983 actions, qualified immunity protects government officials from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Sampson v. County of Los Angeles*, 974 F.3d 1012, 1018 (9th Cir. 2020) (quoting *Pearson v. Callahan*, 555 U.S. 223, 231 (2009)). Therefore, to overcome qualified immunity defense, Mr. Stuart must show the Individual Defendants (1) "violated a federal statutory or constitutional right" and (2) "the unlawfulness of their conduct was clearly established at the time." *District of Columbia v. Wesby*, 138 S. Ct. 577, 589 (2018). In considering the constitutional violation prong of the qualified immunity standard, a court asks whether if "the facts alleged, taken in the light most favorable to the party asserting injury, show the [official's] conduct violated a constitutional right[.]" *Green v. City and County of San Francisco*, 751 F.3d 1039, 1051 (9th Cir. 2014) (internal quotation marks and citation omitted). The second or clearly established law prong itself "requires two separate determinations[.]" *Id.* at 1052. First, "whether the law governing the conduct at issue was clearly

established[.]" *Id.* (citation omitted).  Second, "whether the facts as alleged could support a reasonable belief that the conduct in question conformed to the established law."  *Id.* (citation omitted).  "Both are questions of law to be determined by the court[,]" but only "in the absence of genuine issues of material fact." *Id.*

The qualified immunity "doctrine provides an immunity from suit rather than a defense to liability . . . and ensures that 'officers are on notice their conduct is unlawful' before being subjected to suit." *Tarabochia v. Adkins*, 766 F.3d 1115, 1121 (9th Cir. 2014) (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)) (citation omitted).  Therefore, "qualified immunity shields an [official] from liability even if his or her action resulted from a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact[.]"  *Lal v. California*, 746 F.3d 1112, 1116 (9th Cir. 2014).  As such, "[q]ualified immunity 'gives government officials breathing room to make reasonable but mistaken judgments about open legal questions.' "  *Lane v. Franks*, 573 U.S. 228, 243 (2014) (quoting *Ashcroft v. al-Kidd*, 563 U.S. 731, 743 (2011)).  "In this way, the doctrine strikes a balance between 'the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably.' "  *Tarabochia*, 766 F.3d at 1121 (quoting *Pearson*, 555 U.S. at 231).  "[T]he ordinary framework for deciding motions for summary judgment applies to motions for summary judgment based on official immunity." *Moreno v. Baca*, 431 F.3d 633, 638 (9th Cir. 2005) (internal quotation marks and citation omitted). Therefore, Defendants have "the burden of establishing that there is no genuine issue of material fact to be resolved regarding [their] immunity."  *Dupris v. McDonald*, 2012 WL 210722, at *3 (D. Ariz. Jan. 24, 2012) (citing *Moreno*, 431 F.3d at 638)).

Mr. Stuart argues the Individual Defendants violated three constitutional rights: (1) Mayor Lane, Attorney Washburn, and Attorney Santaella violated his First Amendment right to be free from viewpoint discrimination (Doc. 298 at 14–17); (2) Officer Cleary and Officer Glenn violated his Fourth Amendment right to be free from arrest without probable cause (*id.* at 11–14); and (3) the Individual Defendants violated his First Amendment right

1   to be free from retaliation.  (*id*. at 17–21).

### 1. First Amendment Right to be Free From Viewpoint Discrimination

Mr. Stuart first argues Mayor Lane, Attorney Washburn, and Attorney Santaella violated his constitutional right to be free from viewpoint discrimination.  (*Id*. at 14–17). As explained above, the state courts have settled that Mr. Stuart was subject to a lawful, viewpoint-neutral, and reasonable speech restriction at the February Meeting.  *See supra* Sections III.C(2), (3)(b)(i).  Therefore, principles of *res judicata* prevent Mr. Stuart from relitigating viewpoint discrimination under the First Amendment to avoid the qualified immunity doctrine.

### 2. Fourth Amendment Right to be Free From Arrest Without Probable Cause

Mr. Stuart next argues Officer Cleary and Officer Glenn violated his Fourth Amendment rights when they arrested him without probable cause for criminal trespass under A.R.S. § 13-1503A.  (Doc. 298 at 11–14).  A.R.S. § 13-1503A provides that "[a] person commits criminal trespass in the second degree by knowingly entering or remaining unlawfully in or on any nonresidential structure or in any fenced commercial yard." A.R.S. § 13-1503A.  As mentioned, the determination of probable cause is based on the totality of the circumstances and "exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested."  *Rodis*, 558 F.3d at 969.  To prevail on qualified immunity grounds, Defendants must establish there is no dispute of material fact as to whether probable cause existed.  *See Dupris*, 2012 WL 210722, at *3 (citing *Moreno*, 431 F.3d at 638).

The Court must first determine where, when, and how Mr. Stuart was arrested to assess probable cause.  Mr. Stuart argues collateral estoppel applies to Judge Sampanes' finding that he was arrested at the podium for trespass, and the Court agrees. (Doc. 298 at 8–9 (citing Doc. 299-1 at 2)).  In the April 22, 2020, Order denying Mr.

Stuart's motion to vacate the State Court Judgment, Judge Sampanes settled that Mr. Stuart was "contemporaneously arrested" when "[a]n officer had to physically touch him to get him to move from the lectern" at the February Meeting.  (Doc. 299-1 at 2).  These facts are conclusive here.[18]  It is also undisputed that Officer Cleary and Officer Glenn were both personally involved in escorting Mr. Stuart outside of the building after his arrest at the podium.  *See Barren v. Harrington*, 152 F.3d 1193, 1194 (9th Cir. 1998) ("Liability under [Section] 1983 must be based on the personal involvement of the defendant.").

Mr. Stuart maintains he was arrested for a civil dispute, while "probable cause can only exist in relation to criminal conduct."  (Doc. 298 at 11).  Mr. Stuart also argues that Officer Cleary arrested Mr. Stuart for a specific intent crime of trespassing when Mr. Stuart lacked the requisite intent.  (*Id*. at 13–14).  But the inquiry under the qualified immunity doctrine is whether there are facts present that could lead a reasonable police officer in Officer Cleary and Officer Glenn's position to believe there was probable cause to arrest Mr. Stuart under A.R.S. § 13-1503A.  *See e.g.*, *Norse*, 629 F.3d at 978 (examining false arrest claims under the qualified immunity doctrine).  Indeed, "qualified immunity shields an [official] from liability even if his or her action resulted from a mistake of law, a mistake of fact, or a mistake based on mixed questions of law and fact[.]"  *Lal*, 746 F.3d at 1116. The Court agrees with the Individual Defendants that Officer Cleary and Officer Glenn's actions under Police General Order 2014 show there was probable cause to arrest Mr. Start for trespassing "when he continued to occupy space he was told he could not[.]" (Doc. 313 at 7).

Mr. Stuart does not dispute that the Police General Order 2014 was clearly established at the time of the February Meeting and provided guidelines to Scottsdale police officers who were assigned the security detail at City meetings.  (Docs. 251-2 at 5;

---

[18] Judge Sampanes' ruling clarifies that all elements of collateral estoppel are satisfied. Mr. Stuart had a full and fair opportunity to litigate when and where he was arrested during the bench trial in the state court proceedings, and it clear that the timing of Mr. Stuart's arrest was essential to Judge Sampanes' finding that Mr. Stuart's guilty verdict for refusing to obey a police offer should not be vacated.   This fact was also essential to the Appeal Ruling's affirmance thereafter.  (*See* Doc. 282 at 85 ("There is no dispute here that, by the time police officers and Stuart were outside the building, Stuart was under arrest.")).

251-4 at 2–3).   Officer Cleary cited to the Police General Order 2014 in the relevant Incident / Investigation Report in support of his understanding that "[t]he Mayor is the designated Parliamentarian for City Council meetings" who "conducts the meeting and is responsible for determining when someone's conduct becomes disruptive" and "officers are directed to wait until directed by the Parliamentarian to take any action."  (Docs. 251-2 at 5).   Officer Glenn stated in his declaration a similar understanding of Police General Order 2014 and that he acted in accordance with Police General Order 2014 at the February Meeting.  (Doc. 251-4 at 2–3).   Moreover, this Court must afford conclusive effect to the Appeal Ruling's findings that "[Mr. Stuart's] conduct at the [February] meeting became disruptive" and "[Mayor] Lane had a duty to maintain decorum in council meetings by ordering disruptive individuals to leave immediately."  (Doc. 282 at 95); *see supra* Sections III.C(2), (3)(b)(i).

Mr. Stuart attempts to raise a series of trivial, immaterial fact disputes. (Doc. 298 at 6–9).   The undisputed facts show that Mayor Lane instructed Scottsdale police officers to escort Mr. Stuart out of the February Meeting, and Mr. Stuart refused to leave to the point where he became disruptive of the February Meeting.  *See* February Video, at 25:58–26:07.   These circumstance could lead a reasonable officer to believe there was probable cause to arrest Mr. Stuart for remaining unlawfully at the podium under A.R.S. § 13-1503A, and that doing so conformed with Police General Order 2014. *See Green*, 751 F.3d at 1052.   Indeed, the fact Mr. Stuart was arrested because *he refused to leave the podium* is further underscored by his issue preclusion argument.   Therefore, the Court finds Officer Cleary and Officer Glenn did not violate Mr. Stuart's Fourth Amendment rights for qualified immunity purposes.

### 3.    First Amendment Right to be Free from Retaliatory Arrest

Last, Mr. Stuart argues the Individual Defendants violated his First Amendment right not to be subjected to retaliatory actions, including arrest.  (Doc. 298 at 17–21).   But to prevail on a retaliatory arrest claim, Mr. Stuart must show the "absence of probable

cause."[19]  *Nieves*, 139 S. Ct. at 1723–24.  The Court already settled that a reasonable officer could have believed probable cause existed to arrest Mr. Stuart a the podium for trespass.  Therefore, Mr. Stuart's  retaliatory arrest claim must fail.  *Id*. at 1725.

### 4.    Qualified Immunity Conclusion

To overcome the Individual Defendants' qualified immunity defense, Mr. Stuart needed to establish that they violated his constitutional rights, and that this violation was of a "clearly established statutory or constitutional right[] of which a reasonable person would have known."  *Pearson*, 555 U.S. at 231.  He has not.  *Res judicata* prevents Mr. Stuart  from  arguing  his  First  Amendment  rights  to  be  free  from  viewpoint discrimination were violated, and the undisputed evidence could lead a reasonable police officer in Officer Cleary and Officer Glenn's position to believe there was probable cause to arrest Mr. Stuart under A.R.S. § 13-1503A.  The Individual Defendants are therefore entitled to qualified immunity.

## IV.    Conclusion

*Res judicata* and qualified immunity prevent Mr. Stuart's from pursuing his remaining claims.  First, the City, Mayor Lane, and Attorney Washburn are entitled to summary judgment on Mr. Stuart's *Monell* claim under Count Nine due to claim preclusion.   Second,  the  issue  preclusion  doctrine  prevents  Mr. Stuart  from  arguing Defendants interfered with his First Amendment rights under Count Two.  Last, the Individual Defendants are entitled to qualified immunity and cannot be held liable for Mr. Stuart's First Amendment retaliation claims, which leaves no independent basis to hold the City liable.

Accordingly,

/ / /

---

[19] *Nieves* also carved out a "narrow" exception for cases where "officers have probable cause to make arrests, but typically exercise their discretion not to do so."  *Ballentine*, 28 F.4th at 62 (citing 139 S. Ct. at 1727 ("[T]he no-probable-cause requirement should not apply when a plaintiff presents objective evidence that he was arrested when otherwise similarly situated individuals not engaged in the same sort of protected speech had not been.")).  Mr. Stuart did not  invoke this exception in either of his response briefs and so the Court need not address it here.  (*See generally* Docs. 298; 299).

**IT IS ORDERED** that Defendants' Motion for Summary Judgment Regarding Qualified Immunity" (Doc. 251) and "Supplement" thereto (Doc. 282) are **GRANTED** as stated herein.  The Clerk of Court is kindly directed to enter judgment accordingly and terminate this action.

**IT IS FURTHER ORDERED** that Defendants' Motion for Reconsideration (Doc. 321) is **DENIED** as moot.

Dated this 27th day of March, 2024.

_____
Honorable Diane J. Humetewa
United States District Judge